[Civ. No. 8536. Third Dist. June 22, 1955.]

ANTHONY ZANARDI, Appellant, v. THE PACIFIC TELEPHONE AND TELEGRAPH COMPANY (a Corporation) et al., Respondents.

C. Ray Robinson, Wallace W. Everett, Jr., William B. Boone and Robert T. McCartney for Appellant.

Pillsbury, Madison & Sutro, John A. Sutro, John B. Bates and Noble K. Gregory for Respondents.

VAN DYKE, P. J.—Plaintiff appeals from the judgment entered upon a jury verdict in favor of defendants, Pacific Telephone and Telegraph Company, a corporation, hereinafter called "the company," and Jane Dubois, its employee.

Appellant was injured by an explosion occurring within an automatic oil burning circulating heater manufactured by H. C. Little Company. The explosion occurred when appellant removed a so-called inspection plate, allowing a large indraft of air. The respondents put on no evidence material here.

Appellant's evidence may be summarized as follows: The heater operates by vaporizing fuel oil into gas and then burning the gas. The oil reaches the heater by gravity from an oil tank located without the company's building. The flow into the heater of the oil is subject to automatic control. As the oil reaches the control unit it remains there until a valve, operated by thermostatic control, opens to allow the oil to flow into the combustion chamber of the heater. The amount of oil in the control unit is limited by a float and valve operating somewhat on the same principle as the carburetor for a gasoline engine. A second float in the control unit is designed to trip a mechanism on the side of the heater, referred to by the witnesses as a "trip," shutting off the oil supply in case there is an excess of oil. A feed control on the outside of the control unit determines the amount of oil which can flow from the control unit into the heater in a given space of time. The device has a setting range divided into six positions and can be manually set at any of the positions numbered 1 to 6. The higher the setting the more oil can flow into the heater, and

the maximum flow at position 6 amounts to 45 cubic centimeters per minute. After the oil leaves the control unit it flows into the lower portion of the combustion chamber, known as the firebox, where it is ignited by an electrically heated element. The resulting heat vaporizes the oil into gas, sending it into the heat chamber, a separate portion of the heater located above the firebox. There the gas is consumed, providing heat. The inspection plate is a 2 inch by $2\frac{1}{4}$ inch plate attached to the firebox by two screws. When the heater is operating it is possible, by opening a door on the side of the heater, to observe the flame in the firebox through a small hole in the inspection plate. It is not uncommon for this or for other automatic oil heaters to become flooded and when this occurs the combustion flame may be located entirely in the heat chamber and not be visible through the hole in the inspection plate. But there is no danger of such a heater exploding under these conditions if it is left alone. If, on the other hand, the heater is flooded with oil and the combustion is confined to the heat chamber, the gases therein not being all consumed, the sudden intrusion of additional air supply into the combustion area can cause an explosion. Removing the plate may supply this condition through allowing a larger supply of air to enter. This does not happen unless the plate is either removed or opened by loosening one screw and removing the other so that it swings free. Plaintiff's expert witness, one Mills, who sells and services the H. C. Little automatic heaters, testified that the inspection plate is removed: 1. To replace the element which ignites the oil; 2. To replace the asbestos wick, a part of the burning device, and, 3. To clean out carbon that has accumulated. He testified that usually the heater is drained of oil before the inspection plate is removed. He testified that generally, and as a precaution against explosion, accumulated oil is drained out of the heater before the inspection plate is removed; that the burner would have to be warm before it would generate gas sufficient to cause an explosion, since a cold burner would not do that; that after the accident out of which this suit arose he was called in to service the heater and found that about a quarter of an inch of oil had gathered in the bottom of the firebox; that the manually operated feed control was set at 6, the maximum setting; that after servicing the heater and putting it back into operation he reset this control at 4 to $4\frac{1}{2}$, allowing less oil to feed into the firebox; that normally there would be little oil in that form in the firebox, it being vaporized practically as fast as it

entered unless, as he put it, "the feed control is set too high." Neither this witness nor any witness testified that the setting of the feed control at position 6 was a dangerous thing to do and it is apparent from the testimony that the setting range was one fixed by the manufacturer as permissible in the use of the heater. There was testimony that this manual control was sometimes locked into the position at which it was set by the installer of the heater if there were either children about who might vary the setting or persons described by the witness as being persons who never can leave things alone. It appears that the heater is one designed and sold for use as an ordinary household appliance, appellant himself testifying that he supplied oil to more than a hundred of such heaters in his community as a part of his business of running a gas service. Mills testified that he had sold and installed upwards of 150 of such heaters.

Coming now to what happened immediately leading up to the injuries for which appellant brought this action, we find there is little dispute between the parties. This heater belonged to the company and was used to heat its office in Angels Camp, California, wherein someone was always on duty. Respondent Dubois was on duty as a night operator December 18, 1951, and was alone. The weather was cold and about 11:30 she noticed that the office was cold and she raised the thermostat setting for the heater. No heat came from the heater, so she telephoned her immediate superior who suggested that she call appellant. This she did at about 12:45 a.m. She told him she thought the heater was out of oil, but he told her he had made a delivery to the outside tank a few days before, and asked her if she would test the trip on the heater to see if it had been accidentally turned off and to call him back. In about 10 minutes she called back and told him she had found the trip was on. She then asked him if he would come down and check the heater. Although he supplied oil to the outside tanks of many of these heaters as part of his business and used one of them to heat his own residence, yet he was not in the business of servicing heaters. However he agreed to go down and he took with him a screwdriver and a pair of pliers. He described his purpose as that of seeing what was wrong with the heater. Respondent Dubois was alone in the office and let him in when he knocked on the door. He testified that they held no conversation whatever except to exchange greetings. She returned to her switchboard. Appellant alone testified as to the actual circumstances of the explosion. He

said when he entered the office he noticed the smell of oil. He put his hand on top of the heater and found it cold and he checked the trip and found it on. He checked the feed control and found the manual control set at position 6. He removed the oil plug and, finding that oil came out, he screwed the plug back in. He looked through the hole in the inspection plate and saw no flame. He proceeded to unscrew the plate from the firebox, either, as he said, loosening one screw and removing the other so that the plate could drop down or removing both screws and taking the plate off. Whichever he did, the plate was effectually removed from the opening in the cover and, as he put it, "when that dropped down the air hit and it exploded." The heater was not blown apart by the explosion but the force of the explosion threw flaming oil against him as he stood in front of the opening from which the plate had been removed and he suffered the injuries for which he brings his action. It is to be noted that he was neither given nor did he ask any information as to the condition of the heater, except that he was told the heater was not giving off heat. There is nothing to indicate that Dubois knew anything about the heater which she could have told him. Expert testimony supplied by appellant was to the effect that if gases produced by heating fuel oil accumulated, without burning as they were given off, through lack of oxygen supply from air introduced into the combustion chamber, a potentially dangerous condition would be set up; that if, into the heated gases, air in sufficient quantity was suddenly introduced the resulting immediate combustion of the accumulated gas could generate explosive force. It was the opinion of the experts that this situation existed and that when appellant removed the inspection plate he in effect triggered the explosion by thus suddenly introducing a large quantity of air into the heated gases in the heating chamber.

Appellant, acting on the assumption that he proved a prima facie case of negligence on the part of the company and Dubois, contends that certain instructions given by the court were prejudicially erroneous. Respondents make the counter-argument that no case was proved against them and that, therefore, appellant's case could not have been injured, even assuming erroneous instructions to have been given, since respondents were in any event entitled to a verdict as a matter of law. We have concluded that these contentions of respondents must be sustained. Respondents pleaded both contributory negligence and assumption of risk, but we think

that there was complete failure to prove primary negligence of respondents. Automatically controlled oil-fueled heaters are in common use. There was no attempt made to prove that this particular heater was in any way faulty in design, or that whoever set the manual control at position 6, permitting, subject however to the automatic controls, the maximum inflow of fuel oil, was guilty of doing a negligent act. We say this over the protests of appellant who largely bases his claim of negligence upon it. No witness, however, testified that such a setting was negligent. Appellant's expert witness said this control was set at 4 to 4½, but not for reasons of safety. This was done because at that setting maximum efficiency was achieved. Appellant argues that when Mills serviced the heater about six or seven hours after appellant was injured he (Mills) found the bottom of the firebox covered with oil and therefrom drained enough to half fill a 2-pound coffee tin; and that this shows the maximum setting of the control to have been the cause of flooding the firebox. But this does not prove negligence of respondents, assuming they made the setting. The heater was designed to operate at this setting. We have searched this record in vain for proof of any negligent act or omission of respondents insofar as operation or maintenance of the heater by them is concerned. Indeed, there is no proof of any sort of operation other than the automatic operation as planned and designed by the maker of the heater.

Appellant contends further that respondents were guilty of negligence in asking him to come upon their premises and check and adjust the heater without warning him as to the potentially dangerous situation into which he entered, charging them with the duty of knowing that this situation existed. Says appellant: "Defendants were under a duty to know intimately their own appliances and to relay information regarding their condition to those whom they ask to work on them." And he cites *Moran* v. *Zenith Oil Co.*, 92 Cal. App.2d 236 [206 P.2d 679], quoting from page 242 the following:

"In asserting that the court should have granted each motion made by it at the trial, appellant puts much stress upon its claim that respondent knew as much about the defective cable as appellant knew and with such knowledge freely elected to use it. This may be conceded, but the argument misses the point that the duty of appellant was to know intimately the true condition of its own appliances and to

relay such information to workmen who were to decide whether or not to make use thereof.''

The quotation demonstrates that the rule there enforced does not apply to the situation here. There plaintiff, as a member of a work crew, made use of a cable furnished by defendant for the purpose of pulling pipe from oil wells. The cable proved too weak for its task and plaintiff was injured. The rule relied upon is related to the duty of one who furnishes tools and appliances for use in doing work on his premises to take reasonable care that such appliances are safe for such use. No such situation is presented here. Defendants here furnished no tools or appliances to appellant for use by him in the task he had assumed. The situation is much more akin to that presented in such cases as *Kowalsky* v. *Conreco Co., Inc.*, 264 N.Y. 125 [190 N.E. 206, 208], where a landowner employed a contractor who engaged a subcontractor to make repairs to shutter and window fastenings, and the court declared:

''. . . The owner is not liable for this unfortunate accident on the ground that he had furnished John and his employees or subcontractor an unsafe place to work, as Kowalsky, John's employee or subcontractor, was killed through defects which John was in the act of repairing.''

In 56 Corpus Juris Secundum, ''Master and Servant,'' section 250, it is said:

''The rule requiring an employer to furnish his employees with a safe place to work is inapplicable to employees hired to make a dangerous place safe or to effect repairs.''

It does appear from the evidence that, assuming hot gas had accumulated, the sudden intrusion of a quantity of air sufficient for the quick combustion of the gas in the heat chamber could cause an explosion. Thus the heater may be said to have constituted a potential hazard to any one who did what appellant did, that is, complete the conditions of explosion by removing the inspection plate. We know of no rule of law by which a knowledge of this condition could be charged to respondents upon the basis of an active duty to ascertain if that condition existed; and there is no evidence that respondents had actual knowledge. We think it would be just as unreasonable to charge them with a duty to ascertain that condition as it would be to charge a housewife with such a duty when her cooking stove failed to perform its functions and she called in a repairman. To be sure, the heater belonged to respondent company, and respondent Du-

10

bois was in the office which the heater was intended to keep warm. It is true also that she called appellant for aid. She did not pretend to tell him or to be able to tell him what was wrong with the heater and he asked no questions, but apparently acted upon his own assumption that he needed no information. Treating him as a business invitee upon the premises of the respondent company, we find that his case does not meet the requirements for imposing liability upon the respondent as possessor of land to business visitors thereon. This liability is thus stated in Restatement of the Law of Torts, section 343:

"A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he

"(a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and

"(b) has no reason to believe that they will discover the condition or realize the risk involved therein, and

"(c) invites or permits them to enter or remain upon the land without exercising reasonable care

"(i) to make the condition reasonably safe, or

"(ii) to give a warning adequate to enable them to avoid the harm without relinquishing any of the services which they are entitled to receive, if the possessor is a public utility."

This record is utterly lacking in proof of actual knowledge that unconsumed combustible gases heated to the point of ignition were contained in the heat chamber which would explode if air should suddenly be introduced by the removal of the inspection plate. It is equally barren of proof that ordinary care would have revealed that condition.

Appellant argues that the rule res ipsa loquitur applies here. It does not. While this common household appliance was owned and used by, and may be said to have been controlled and managed by respondents, it cannot be said that this accident was such as in the ordinary course of things does not happen if those who have the management and control of such an appliance use proper care. We use a great many household appliances and nearly all of them have automatic controls built in. These appliances operate so well that knowledge of how they operate is not required of the user. We use them until they stop working and then call in the service man. The proven conduct of respondents

was within the norm, and from the circumstances proven the inference of negligence could not be drawn.

Appellant noticed an appeal from the judgment entered upon the order of nonsuit against defendants Hale and Simondet. However, appellant's briefs deal entirely with his attack upon the judgment against the company and its employee and have nothing to say by way of attack upon the nonsuit judgment. We, therefore, deem the appeal from that judgment abandoned.

All judgments appealed from are affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied July 15, 1955, and appellant's petition for a hearing by the Supreme Court was denied August 17, 1955. Carter, J., was of the opinion that the petition should be granted.