Opinion
 

 TAYLOR, P. J.
 

 In these consolidated actions,
 
 [1]
 
 Southern Pacific Transportation Company (Southern Pacific) appeals from adverse judg
 
 *769
 
 ments entered on ten-two verdicts in favor of the tenants and owners, who sought property damages after Southern Pacific’s Kentucky Street warehouse (warehouse) was completely destroyed by a five-alarm fire on June 29,
 
 [2]
 
 On its appeals, Southern Pacific contends that the cumulative effect of the following errors on the only and close issue of its liability requires, reversal: 1) insufficiency of the evidence to support the judgment and verdict, as there was no substantial evidence of its negligence; 2) the court’s conditional res ipsa instruction and refusal of Southern Pacific’s proffered instructions on contributory negligence and BAJI No. 3.13 (right to assume the good conduct of others); 3) the admission into evidence of certain accident reports prepared by some of Southern Pacific’s employees; 4) the introduction into evidence of a request for the admission of interrogatories propounded by Southern Pacific to its codefendant Reikes, and Reikes’ responses; and 5) the exclusion of Southern Pacific’s evidence as to its duty of reasonable care under the particular economic circumstances of a low rent warehouse.
 

 The tenants and owners appeal from that portion of the judgments after a court trial
 
 [3]
 
 denying them prejudgment interest. They contend that Civil Code section 3287, subdivision (a), applies to tort actions for property damage, and that in the instant case their damages were certain or capable of being made certain within the language of the statute, We have concluded that the portion of the judgment on the verdict against Southern Pacific must be affirmed; however, the portion of the judgment denying prejudgment interest must be reversed as prejudgment interest pursuant to Civil Code section 3287, subdivision (a), is available as a matter of law in tort actions for property damages
 
 *770
 
 from the date when the defendant has notice of an amount certain or capable of being made certain.
 

 I Southern Pacific’s Appeal
 

 Viewing the record most strongly in favor of the judgment on the verdict against Southern Pacific,
 
 [4]
 
 the following facts appear: In 1969, Southern Pacific’s warehouse was located in the Mission Bay Yard, an unfenced freight switching yard that is part of a complex of transportation facilities located near San Francisco Bay.
 

 The warehouse, a wooden shed built in 1907, fronted to the east on 1400 Third Street; to the west, there was a railroad switching yard. The warehouse was 80 feet wide and originally 1,064 feet long; however, an earlier fire on February 7, 1969, had destroyed approximately 113 feet of the north end of the warehouse. The warehouse rested on piers approximately three feet above the ground on the rail side to accommodate freight-hauling wagons. The open space beneath was insufficiently enclosed with boards and wire screens, as a number of screens and boards were missing or loose. Thus, the southern end of the warehouse was not enclosed. As there were no barriers, the 951-foot length of the space underneath the building at the time of the June 29, 1969 fire created a wind tunnel effect.
 

 The warehouse was the oldest building in the Mission Bay Yard, and characterized as hazardous by experts because of its age, design and all wood construction. The individual bays exceeded 10,000 square feet and made containment of the fire difficult. As the result of the poor condition of the boards and screens, there was access to the area below the warehouse for itinerants. In addition, there was an accumulation of debris borne across the yard by the prevailing westerly winds.
 

 Immediately abutting the southern end of the warehouse was a 125-foot extension known as the Coors Building. In 1947, Levy-Zentner built a warehouse a few feet south of the Coors Building. Levy-Zentner’s
 
 *771
 
 building was 300 feet long, but 13 feet narrower than the neighboring buildings, and had a concrete foundation. The Levy-Zentner building had a standard fire wall, “the most foolproof fire protection tool available.”
 

 The Southern Pacific warehouse had no fire walls and was an “open area” from “a fire protection point of view.” There were no automatic or manual alarm systems or a sprinkler system in the warehouse or nearby area. The available city fire hydrants were inadequate and Southern Pacific did not provide additional private hydrants of its own.
 
 [5]
 

 The day of the fire, Sunday, June 29, 1969, was clear, windy and quiet. The only tenant activity at the warehouse was a brief visit by Mr. S. DiLeo, of L & S Drayage, between 12:45 and 1:30 p.m. There was some switching activity in the yard, but none on Track 178, the one immediately adjacent to the warehouse, Coors, and Levy-Zentner buildings. At this time, the area “is virtually abandoned except for passing police cars.” “Most security rounds are set up to give the greatest coverage of properties during periods of time when they are otherwise unattended.” .On June 29, 1969, Southern Pacific had only one patrolman for all of its spurs in the City and County of San Francisco. No one was patrolling the Mission Bay Yard.
 

 Southern Pacific’s Mission Bay yardmaster, William Honsinger, was the first witness to the fire. At 5:05 p.m., he was standing outside the yard office southwest of the warehouse about three-fourths of the way toward its north end.
 
 [6]
 
 Honsinger went into the yard office and telephoned Mr. McDonnell of Southern Pacific’s police department to advise him that there was smoke near Track 178.
 

 Honsinger then took a two-gallon water fire extinguisher from the yard office and drove down between the tracks to a point five tracks west of Track 178. Honsinger did not call the fire department as the fire appeared too insignificant to him. He crossed three or four of the tracks
 
 *772
 
 and then realized that the smoke was coming from underneath, rather than beside, the warehouse. Honsinger returned to his vehicle and radioed McDonnell. McDonnell initially did not notify the fire department as he thought Honsinger could handle the matter on his own. McDonnell’s report to Stone, Southern Pacific’s chief special agent, indicated that he had telephoned the fire department at 5:30 p.m. Honsinger estimated the elapsed time between the first telephone call and subsequent radio call as about five minutes. Honsinger first stated that he telephoned the fire department at the first sighting at 5:05 p.m., but then admitted that he never notified the fire department.
 

 Southern Pacific Police Patrolman Dennis Barlesi intercepted Hon-singer’s radio call while he was at Fourth and Berry Streets, about 5:10 or 5:15 p.m. Barlesi could not remember a request made by Honsinger to notify the San Francisco Fire Department. Barlesi immediately drove to the warehouse, parked on the east side, and went around to the west side of the warehouse to combat the fire with a small C02 fire extinguisher.
 
 [7]
 
 He saw smoke coming from underneath the warehouse and the floor burning from beneath. He also saw “Flames on the underpart of the loading dock creeping along the loading dock itself.” Barlesi did not notify the fire department as he assumed that someone had already done so. By this time, neither he nor Honsinger nor McDonnell had notified the San Francisco Fire Department.
 

 The fire department’s official records indicated that the first alarm was received at 5:18 p.m.,
 
 [8]
 
 13 minutes after it was first seen by Honsinger. According to the tenants’ and owners’ expert Berg, this 13-minute delay in reporting the fire made the difference between a fire that might have been contained and the violent, uncontrollable blaze that occurred.
 

 Engine Company 19, stationed one block from the warehouse, was the first fire unit to arrive on the scene; Company 19 arrived on the east side of the warehouse at about 5:19 p.m., within one and one-half minutes of the first alarm. Milton Anderson, a fire-fighter in No. 19, stated that they forcibly opened a door on the east side of the warehouse at 5:21 p.m. and that approximately 30 seconds later there was an explosion which
 
 *773
 
 knocked down and injured nearby fire fighters. At the same time, on the west side of the warehouse, Barlesi was similarly injured by the sudden blast.
 

 San Francisco Fire Investigator, Robert Gerhow, and Inspector O’Donnell, stationed at Engine Company 14 at Oak and Franklin Streets, responded to the second alarm at 5:23 p.m., and arrived at about the time of the third alarm (5:23 p.m.). The city’s investigation began with an interview with Honsinger in the yard office, but was subsequently impeded because the yard office records were neither complete nor up to date.
 

 Joel Springer and his son, Joel, Jr., were outside a firehouse on Third and Howard Streets when they heard the first alarm and responded. The Springers arrived at the fire at about 5:23 p.m. Both were members of the Phoenix Society of San Francisco, an organization of fire photographers. The Springers began to photograph and film the fire at 5:24 or 5:25 p.m., and obtained an unusually complete film record that was used by the experts of the parties.
 

 The fourth alarm was given at 5:35 or 5:37 p.m.; the fifth at 5:47 p.m. Before the fire was finally contained, it had consumed the warehouse, the Coors Building, the Browning warehouse across Third Street, and half the Levy-Zentner building, as well as Company 19’s fire truck.
 

 Expert Berg indicated that a reasonable maximum distance from a hydrant to a building would be 100-150 feet. Certain points on the east side of the warehouse were 500 feet from the city hydrants on Third Street; on the west side, the warehouse could be reached only by 1,500 feet of hoses laid across the railroad tracks to a hydrant at the intersection of 9th and 16th Streets. Berg further opined that the observations and recommendations of a fire protection engineer are meaningless unless the organization is sufficiently fire conscious and willing to implement them.
 

 Southern Pacific’s chief fire protection engineer, George Rear, limited his annual inspections of the Mission Bay Yard to making certain that the tenants did not introduce a major fire problem to the building. He did not have keys to inspect the interior premises if any of the tenants were absent. Honsinger also neither inspected nor talked with the tenants of the warehouse. Rear could not request repairs over $500 without the
 
 *774
 
 approval of the chief engineer. For repairs under $500, Rear dealt with the superintendent of the bridge and building department who, in turn, would instruct his men to do it. This procedure meant some delays but was a considerable improvement over the more cumbersome overlapping paperwork procedures that existed before 1960.
 

 Robert Bushner, the chief clerk of Southern Pacific’s real estate department, testified that his department did not inspect the company’s facilities but depended on the report of the fire engineers, or waited for the complaint of a tenant. Bushner could not recall that in February 1969, Olds, an employee of codefendant Reikes (another tenant), had complained about itinerant activity in and around the warehouse.
 

 Rear assumed that he was required to inspect the premises of the tenants but, as indicated above, had no .keys to do so in the absence of the tenants. Neither McDonnell nor Clarence Champlin, Southern Pacific’s chief special agent of its police department, thought he had responsibility for the leased areas. McDonnell, however, indicated that he would have patrolled the vacant areas of the warehouse if there had been any in June 1969. In fact, about 150 linear feet in the center of the warehouse were not leased at that time.
 

 Southern Pacific’s fire prevention engineer, Klehs, indicated that the tenants were responsible for cleaning up around the warehouse, although Southern Pacific was responsible for keeping clean the areas of the warehouse it occupied solely. The precise cleanup obligations of Southern Pacific and its tenants were determined by the company’s real estate department. The real estate department never conferred with the fire prevention engineers or the police department and neither made nor had knowledge of any inspections.
 

 Champlin assumed that his agents were inspecting for weeds or debris near the warehouse. His subordinate, McDonnell, however, was equivocal on that matter.
 

 Although Southern Pacific’s published rules and regulations required inspection of areas underneath the warehouse,
 
 [9]
 
 as a precaution against
 
 *775
 
 itinerant-caused fires, McDonnell asserted that the area underneath the warehouse was outside his area of inspection.
 

 Under the circumstances, none of the experts could establish the cause of the fire with certainty.
 
 [10]
 
 Although Honsinger first believed the fire was a small grass fire between the warehouse and Track 178, upon closer inspection he realized that the smoke was emanating from beneath the warehouse. He so indicated to Gerhaw, Klehs, McDonnell and Barlesi, who overheard Honsinger’s radio call to McDonnell. San Francisco firefighter Anderson also saw the smoke coming from underneath the warehouse. Anderson, after opening the door, saw a hazy glow or hue rather than evidence of burning. The white color, pattern
 
 [11]
 
 and source of the smoke also indicated to Berg and Gerhow that the fire began on the ground under the warehouse rather than within it. Gerhow and Berg
 
 [12]
 
 concluded that it was almost a certainty that the fire began underneath the warehouse.
 

 The experts arrived at their theory of a fire started underneath the warehouse, probably by itinerant activity, by a process of elimination. There was no evidence of lightning. Itinerant activity was further confirmed by the fact that the fire began at a single small point source. Spontaneous combustion could not occur in an area as well ventilated as the warehouse. Arson was also eliminated' after an investigation of the conduct of Mr. Baeza (an employee of the codefendant Reikes) who had mailed a picture of the warehouse taken before the fire to Reikes’ home in Omaha with a request for back pay owed to him.
 

 There was no indication of any tenant activity underneath the warehouse nor of tenant use of devices and appliances with heating elements, flammable fuels or spark plugs. Gerhow’s investigation disclosed that all of the electrical wiring in the warehouse was above the floor. Although sparks from Southern Pacific’s railroad switching opera
 
 *776
 
 tions remained as a potential cause, there was no evidence of any switching operations on that quiet Sunday afternoon.
 

 Itinerant activity remained as the single most likely source, since the warehouse, tenants, Southern Pacific employees and city fire department personnel related repeated instances of itinerant activity in the vicinity of the warehouse. S. DiLeo of L & S Drayage occasionally saw itinerants walking along the Third Street side of the building and after finding signs of attempted entiy, kept dogs on his premises. L. Gandolfo, an employee of Robertson Drayage, heard itinerants behind and beneath the building, found hoards broken in back and often found wine bottles when he opened up the office in the morning.
 

 M. Olds, an employee of Reikes, often saw itinerants drinking wine on the front steps of the Reikes premises. Olds also indicated that S. Reikes had three burglaries attributed to itinerants during the six-month period that preceded the February 1969 fire which destroyed M-Shed, another Mission Bay warehouse. Southern Pacific’s fire prevention engineer, Rear, characterized M-Shed as the twin brother of the warehouse “for all practical purposes,” and attributed that earlier fire to itinerant activity, as evidenced by the cardboard beds he had observed underneath M-Shed just before its destruction in the February 1969 fire.
 

 It is readily apparent from the above summary of the pertinent facts that there was ample substantial evidence to sustain the verdict based on Southern Pacific’s negligence. Southern Pacific neglected the rudiments of basic fire protection and inspection in the old wooden warehouse and in violation of its own regulations failed to take precautions against continuing itinerant activity that had also caused the February 1969 fire. In addition, the responsibilities for fire protection of the warehouse and its tenants were diffused and scattered within Southern Pacific’s organization. Further, the uncontroverted evidence indicated that Southern Pacific’s employees behaved carelessly on the afternoon after the discovery of the fire. Although a fire station was only a half a block away from the warehouse, no Southern Pacific employee reported the fire until 25 minutes after the first sighting. The first notification to the fire department came from a stranger, 13 minutes after Honsinger first saw the smoke. This period of time meant the difference between a containable fire and the holocaust that subsequently occurred.
 

 
 *777
 
 Honsinger’s written report indicated that he notified the fire department at 5:30 p.m., 25 minutes after the first sighting.
 
 [13]
 

 Southern Pacific next contends that the court committed reversible error by giving a conditional instruction on res ipsa loquitur. This form of the instruction leaves the final determination as to the application of the doctrine to the trier of fact (Witkin, Cal. Evidence (2d ed.„ 1977 supp.) §§ 260, 260A).
 

 “ ‘The doctrine of res ipsa loquitur is applicable where the accident is of such a nature that it can be said, in the light of past .experience, that it probably was the result of negligence by someone and that the defendant is probably the one responsible’ ”
 
 (Bedford
 
 v.
 
 Re
 
 (1973) 9 Cal.3d 593, 597 [108 Cal.Rptr. 364, 510 P.2d 724]). This “common sense inference” arises when the following three conditions are satisfied: 1) the accident must be of a nature which ordinarily does not occur in the absence of someone’s negligence; 2) the accident must have been caused by an agency or instrumentality in the control of a defendant; 3) the injury must not be due to any voluntary action or contribution on the part of plaintiff
 
 (Newing
 
 v.
 
 Cheatham,
 
 15 Cal.3d 351, 359 [124 Cal.Rptr. 193, 540 P.2d 33]).
 

 Southern Pacific argues that all three conditions must be conclusively satisfied before an instruction is proper. However, under the law, these are precisely the questions for the jury to decide. It must determine whether plaintiffs have satisfied the conditions for application of the doctrine of res ipsa loquitur. The issue was so presented in the instructions, as the jury was directed that it must decide whether the accident in question occurred under circumstances in which the three specified conditions were present. The court then directed that if, and only in the event that the jury should find all those conditions to exist,
 
 *778
 
 from the happening of the accident, an inference arises that a proximate cause of the occurrence was some negligent conduct on the part of the defendant. These instructions then stated the effect of the inference (cf.
 
 Springer
 
 v.
 
 Reimers,
 
 4 Cal.App.3d 325, 333 [84 Cal.Rptr. 486]).
 

 As stated in
 
 Albers
 
 v.
 
 Greyhound Corp., 4
 
 Cal.App.3d 463, at page 474 [84 CaLRptr. 846]: “ ‘In considering the applicability of res ipsa, it is not for the trial court to ascertain whether a defendant’s negligence is,the more likely explanation of the accident. The court merely determines whether the plaintiff has produced sufficient substantial evidence to permit a jury to draw such an inference. Where reasonable men may differ as to the balance of probabilities, the trial judge must leave the question to the jury. . . . The jury, under appropriate contingent instructions, should have been permitted to conclude whether the three factual conditions of the doctrine had been met [citations].’ ” (See also
 
 Rimmele
 
 v.
 
 Northridge Hosp. Foundation,
 
 46 Cal.App.3d 123 [120 CaLRptr. 39].)
 

 Our above summary of the evidence readily indicates that each of the three conditions was met.
 

 As to the first condition, unlike
 
 Zanardi
 
 v.
 
 Pacific Tel. & Tel. Co.,
 
 134 Cal.App.2d 3 [284 P.2d 851], and
 
 Tedrow
 
 v.
 
 Des Moines Housing Corporation,
 
 249 Iowa 766 [87 N.W.2d 463, 86 A.L.R.2d 830], cited by Southern Pacific,, here there was valid proof of the cause of the warehouse fire, not mere conjecture. The photographs, movies, testimony of eyewitnesses, and investigations compelled experts Gerhow and Berg to conclude that the fire began underneath the warehouse. That origin, in a well-ventilated area separated from tenant activity and without electrical wiring, devices, heating elements or other causes of ignition, persuaded the experts that the fire was caused by itinerant activity.
 

 The tenants’ and owners’ task was to present sufficient evidence from which the juiy could decide that negligence is the most likely explanation
 
 (Di Mare
 
 v.
 
 Cresci,
 
 58 Cal.2d 292, 298-299 [23 CaLRptr. 772, 373 P.2d 860]). In making this determination, the jury may consider common knowledge, the testimony of expert witnesses, and the circumstances relating to the particular accident at issue
 
 (Zentz
 
 v.
 
 Coca Cola Bottling Co.,
 
 39 Cal.2d 436, 446 [247 P.2d 344]). Numerous decisions of the courts of this state have upheld conditional res ipsa loquitur instructions in cases involving fire and smoke damage
 
 (Pappas
 
 v.
 
 Carson,
 
 
 *779
 
 50 Cal.App.3d 261 [123 CaLRptr. 343];
 
 Homer
 
 v.
 
 Barber,
 
 229 Cal.App.2d 829 [40 Cal.Rptr. 570, 8 A.L.R.3d 966];
 
 Roddiscraft, Inc.
 
 v.
 
 Skelton Logging Co.,
 
 212 Cal.App.2d 784 [28 Cal.Rptr. 277]).
 

 Roddiscraft, supra,
 
 is illustrative, as there the trial court refused a conditional res ipsa loquitur instruction in an action for property damage caused by a forest fire. Although the cause of the fire was unknown, and experts testified to several possible causes, one expert stated that in his opinion the fire was caused by sparks from defendant’s tractor. This court (Division One) affirmed an order granting a new trial and held at page 797: “The inference of negligence which the jury may draw need not be a conclusive or compelling one. Where reasonable men may differ as to the balance of probabilities, the question whether an inference of negligence is to be drawn is one for the jury.
 
 (Seneris
 
 v.
 
 Haas, supra,
 
 45 Cal.2d 811, 827 [291 P.2d 915, 53 A.L.R.2d 124].)” In the instant case, the tenants and owners properly maintained that res ipsa loquitur was conditionally applicable, not only as to the situation in the old warehouse, but also as to the inadequacy of Southern Pacific’s fire prevention and inspection practices, as well as the negligence of its employees, in failing to promptly report the fire to the nearby fire station and prevent its spread.
 

 As to the evidence of the second factor, i.e., whether the accident was caused by an instrumentality in the control of Southern Pacific, there can be no dispute, as Southern Pacific was responsible for policing the area around and underneath the warehouse, and everything occurred on its property. Southern Pacific acknowledged a duty to maintain the boards and screens around the base of the warehouse. Southern Pacific regulations directed its agents to “energetically follow up” any evidence of itinerant activity under wooden platforms. Southern Pacific track maintenance personnel were to control weeds and debris alongside the warehouse.
 

 Nor can Southern Pacific be exculpated by its argument that a “third party” was responsible for the fire. There was evidence that itinerant activity, and the dangers it presented, were patent, foreseen and ignored by Southern Pacific. Where the only reasonably probable causes of the accident are due to the conduct of defendant and a third party, and where defendant is legally responsible for the conduct of the third party, the second condition is satisfied since the defendant is then responsible for all probable instrumentalities that caused the injury
 
 *780
 

 (Pappas
 
 v.
 
 Carson,
 
 50 Cal.App.3d 261, 268 [123 Cal.Rptr. 343];
 
 Rose
 
 v.
 
 Melody Lane,
 
 39 Cal.2d 481, 486-487 [247 P.2d 335];
 
 Poulsen
 
 v.
 
 Charlton,
 
 224 Cal.App.2d 262, 268 [36 Cal.Rptr. 347]).
 

 Southern Pacific’s brief is silent as to the third requirement, the absence of any voluntary action by the tenants and owners. Obviously, no one of the tenants and owners was responsible for the condition of the warehouse, the inadequate fire prevention organization and inspections, the response to the fire hazard presented by itinerants, in violation of Southern Pacific’s own regulations, or for the delay and careless behavior of Southern Pacific’s employees on the day of the fire.
 

 Neither
 
 Snyder
 
 v.
 
 Hollingbery,
 
 141 Cal.App.2d 520 [297 P.2d 485], nor
 
 Hubbert
 
 v.
 
 Aztec Brewing Co.,
 
 26 Cal.App.2d 664 [80 P.2d 185, 1016], cited by Southern Pacific, are apposite or good law as neither involved the propriety of a conditional res ipsa loquitur instruction. Further, both Snyder and Hubbert antedate the enactment of Evidence Code section 646 (Stats. 1970, ch. 69, § 1), set forth below,
 
 [14]
 
 which modified and clarified the law, as we indicated in
 
 Slater
 
 v.
 
 Kehoe,
 
 38 Cal.App.3d 819, footnote 11, at page 832 [113 Cal.Rptr. 790]. (See also
 
 Cline
 
 v.
 
 Lund,
 
 31 Cal.App.3d 755, 761-762 [107 Cal.Rptr. 629].)
 

 We conclude that under the facts and circumstances of this case, the conditional res ipsa instruction was properly given.
 

 Southern Pacific next contends prejudicial error in the refusal of its proffered instruction based on BAJI No. 3.13, set forth below.
 
 [15]
 

 
 *781
 
 Preliminarily, we note that Southern Pacific did not challenge the following instruction, based on a modification of BAJI No. 3.79: “If you find that the defendant was negligent and that if negligence was a proximate cause in bringing about damage to the plaintiffs, the fact that there was also negligent conduct of a third person, does not relieve defendant of liability if the defendant realized or should have reasonably realized that a third person might act as he did.”
 

 We think the instruction was properly refused, as it was not supported by the record. The issue was Southern Pacific’s negligence in failing to respond to the fire hazards of the warehouse, including the danger presented by itinerants camping, smoking and cooking underneath the warehouse. The instruction proffered by Southern Pacific would exculpate it of responsibility for a third party’s negligence by overlooking the crucial issue of foreseeability.
 

 As stated in
 
 Vesely
 
 v.
 
 Sager,
 
 5 Cal.3d 153, at pages 163 and 164 [95 Cal.Rptr. 623, 486 P.2d 151]: “... an actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct. [Citations.] Moreover, ‘If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.’ (Rest.2d Torts, § 449....)”
 

 The foreseeability of itinerant activity was an obvious issue in this case and the tenants and owners presented evidence strongly indicating that the fire danger presented by itinerants was reasonably foreseeable. As indicated above, Southern Pacific’s fire protection engineer, Rear, admitted that transients caused a fire about every other year on Southern Pacific property, including the fire which destroyed an almost identical warehouse in the Mission Bay Yard in February 1969. Furthermore, Southern Pacific’s rule 139 stated: “Evidence of itinerants camping under wooden platforms around stockyards, or under bridges, must be energetically followed to prevent fires being built in hazardous locations.”
 

 
 *782
 
 The inadequacy of BAJI No. 3.13 is apparent: Southern Pacific was not entitled to assume that “every other person will perform his duty and obey the law” when the foreseeability that itinerant persons would act as they did was an issue. The instruction, as proposed, was unqualified and misleading. Failure to adequately qualify such an instruction where the foreseeability of another party’s negligence is in issue is error
 
 (Angier
 
 v.
 
 Brack,
 
 56 CaI.App.2d 55, 58-59 [131 P.2d 876];
 
 Carlson
 
 v.
 
 Shewalter,
 
 110 Cal.App.2d 655, 658-659 [243 P.2d 549];
 
 Vernon
 
 v.
 
 Owl Truck & Construction Co.,
 
 137 Cal.App.2d 437, 438-439 [290 P.2d 603];
 
 Koenig
 
 v.
 
 Coe,
 
 163 Cal.App.2d 429, 432-433 [329 P.2d 721]). As succinctly noted in
 
 Edlund
 
 v.
 
 Los Angeles Ry. Co.,
 
 14 Cal.App.2d 673, at page 675 [58 P.2d 928]: “One may not continue to assume that the law is being observed after knowing or having an opportunity, by the use of reasonable care, to know that it is not being observed.”
 

 In addition, the proffered instruction assumed as true a disputed fact that was central to the issue of liability, namely, that Southern Pacific was exercising ordinary care. Under the instant circumstances, therefore, the instruction was not only confusing and misleading, but invaded the province of the juiy to determine disputed facts
 
 (Slovick
 
 v.
 
 James I. Barnes Constr. Co.,
 
 142 Cal.App.2d 618 [298 P.2d 923]).
 

 Although a party is entitled to instructions on his theory of the case, if reasonably supported by the pleadings and the evidence, instructions must be properly selected and framed. The trial court is not required to give instructions which are not correct statements of the law or are incomplete or misleading
 
 {Hardin
 
 v.
 
 Elvitsky,
 
 232 Cal.App.2d 357, 372 [42 CaI.Rptr. 748], and cases cited therein). Furthermore, we agree that an examination of all of the instructions given discloses that the court correctly and adequately covered the issues of negligence, proximate cause, foreseeable intervention and superseding cause. Accordingly, Southern Pacific’s proffered instruction was properly refused
 
 (Libby
 
 v.
 
 Dunston,
 
 72 Cal.App. 494, 496 [237 P. 565]).
 

 Southern Pacific further contends that the court erred in withdrawing contributory negligence as an issue at the end of the trial. The record indicates (as Southern Pacific admits) that the issue was withdrawn from the jury as the court concluded as a matter of law that there was insufficient evidence before the jury to make the theory tenable.
 

 
 *783
 
 Southern Pacific maintains that G & S Drayage and Economy were contributorily negligent as they were aware of the building’s condition and the presence of transients, but it fails to support its contention by any citation of the record.
 
 [16]
 
 Assuming, arguendo, that these tenants had knowledge, and that their acquiescence constituted negligence, Southern Pacific was still required to show that their negligence was a proximate cause of their injuries.
 
 Gyerman
 
 v.
 
 United States Lines Co.,
 
 7 Cal.3d 488 [102 Cal.Rptr. 795, 498 P.2d 1043], is dispositive of the issue here. In
 
 Gyerman,
 
 in reversing the judgment against the plaintiff, our Supreme Court held that although there was evidence that plaintiff failed to use ordinary care for his own protection by not stopping work because of unsafe working conditions, this was not sufficient to establish the defense of contributory negligence. The defendant employer alone created the risk of harm, and defendant did not show that the plaintiff’s failure to complain prevented its alleviation. In the instant case, Southern Pacific does not argue and cannot argue that G & S Drayage and Economy concealed the presence of itinerants or that it did not have notice of the condition and its attendant dangers. Nor were G & S Drayage and Economy responsible for correcting these conditions, starting the fire, or in any way contributing to its spread. There was also no evidence that these tenants had any opportunity to report the fire.
 

 Although a party is entitled to instructions on his theory of the case, it is not only improper, but error to instruct on any theory that is inapplicable to issues raised by the pleadings, or is unsupported by the evidence
 
 (DeCruz
 
 v.
 
 Reid,
 
 69 Cal.2d 217, 230 [70 Cal.Rptr. 550, 444 P.2d 342];
 
 Leo
 
 v.
 
 Dunham,
 
 41 Cal.2d 712, 714 [264 P.2d 1];
 
 Majetich
 
 v.
 
 Westin,
 
 276 Cal.App.2d 216, 220 [80 Cal.Rptr. 787];
 
 Hamano
 
 v.
 
 Edelson,
 
 251 Cal.App.2d 784, 790 [60 Cal.Rptr. 62]). We conclude that the contributory negligence issue was properly withdrawn as a matter of law.
 

 Southern Pacific further argues that the trial court erred by admitting its telegraphic report of the accident and the final accident report. There is no merit to this contention. Both reports were business records. The record indicates that Southern Pacific’s terminal superintendent, J. Bays, out of the presence of the jury, stated that: 1) he.was custodian of telegraphic report No. 682928, and the final report of accident; 2) the reports were records of an act, condition, or event, made near the time of happening; 3) the reports were made in the regular course of business,
 
 *784
 
 based upon an investigation conducted under his authority, by assistant terminal superintendent Brockman and dated July 7, 1969, and July 9, 1969.
 

 Southern Pacific urges that the trial court failed to make a finding as to the “trustworthiness”
 
 of
 
 sources of information for these reports, as required by Evidence Code section 1271, set forth below.
 
 [17]
 
 The record, however, indicates that the trial court heard arguments and objections, took the matter under submission, researched the issue, and made a determination which included an evaluation of the reliability of the sources of information for the report. Explicit findings on this point are not necessary:
 

 “Evidence Code § 1271(d) requires, as a condition for admissibility of a writing under the business records hearsay exception, that the judge find that (1) the sources of information and (2) the method and time of preparation of the writing ‘were such as to indicate its trustworthiness.’ This does not mean that the judge must make an express finding on the court record. A ruling admitting a writing in evidence under this hearsay exception is deemed an implied finding by the trial judge that these two requirements are present to indicate trustworthiness of the writing. See Evid. C § 402(c).” (Jefferson, Cal. Evidence Benchbook § 4.5, Com., p. 87.)
 

 The business record exception grants the trial judge wide discretion in determining whether a proper foundation has been laid to admit the reports
 
 (Cole
 
 v.
 
 Ames,
 
 155 Cal.App.2d 8, 18 [317 P.2d 662];
 
 People
 
 v.
 
 Torres,
 
 201 Cal.App.2d 290, 295 [20 Cal.Rptr. 315]). Every authority relied upon by Southern Pacific pertained to proffered business records excluded by the trial court and upheld on appeal. In
 
 Dahl-Beck Electric Co.
 
 v.
 
 Rogge,
 
 275 Cal.App.2d 893 [80 Cal.Rptr. 440], for example, the Court of Appeal sustained the trial judge’s rejection of a self-serving accident report prepared and offered by the plaintiff where the trial judge had discounted its trustworthiness and plaintiff/appellant provided neither argument nor authorities on appeal.
 

 
 *785
 
 In any event, the revision of the business record exception made by the Evidence Code
 
 [18]
 
 strongly supports a more liberal application and broader trial court discretion as to the business records exception. In
 
 People
 
 v.
 
 Williams,
 
 36 Cal.App.3d 262, at pages 274 and 275 [111 Cal.Rptr. 378], the Court of Appeal rejected arguments for restricting trial court discretion. Appellant, convicted of diverting gasoline stocks in an embezzling scheme, objected to admitting a service station’s “monthly profit guidebook,” containing a record of gasoline inventory prepared from notes and forms written by unidentified employees. Admission of this report was upheld on appeal as follows, at page 275: “The object of the statute is, of course, to eliminate the necessity of calling each witness. The foundation for admitting the record is properly laid if in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission. This places a broad discretion in the trial court which will not be disturbed on appeal. [Citation.] The reasonable inference was that the stick readings were prepared by Blackburn’s employees in the normal and usual method. This method was sufficiently trustworthy to be relied upon by Blackburn in the ordinary course of his business. Blackburn verified the most recent reading by sticking the tank himself. The records were admissible. [Citation.]”
 

 In the instant case, likewise, the court properly concluded that the method and mode of preparation were sufficiently trustworthy to permit both reports to be admitted. Both were prepared by assistant terminal superintendent Brockman, a division officer of Southern Pacific, in the course of his official responsibility to investigate and determine the causes of industrial accidents. Both reports were sufficiently “trustworthy” for Superintendent Bays to approve without criticism and for delivery to several Southern Pacific departments.
 

 Damage estimates were obtained from the office of division superintendent Jones’ office and admitted without issue. However, those portions of both reports pertaining to the cause of the fire require more extensive discussion. The uncontroverted evidence indicates that all of the witnesses to the fire who arrived before the fire department were employees of Southern Pacific, e.g., Honsinger, Barlesi, McDonnell and perhaps members of the switching yard crews. Thus, Brockman’s report
 
 *786
 
 was based upon reports of company employees who were charged by Southern Pacific rules and regulations to report to their superiors. In addition, Klehs, who was acting chief of fire prevention, investigated the fire shortly after it occurred. Thus, it is also reasonable to conclude that Brockman’s report was based upon Klehs’ investigation.
 

 “[T]he requirement of a business duty to transmit the information seems a reasonable means of assuring reliability, and it seems likely that most courts would read the Commonwealth Fund Act or the Uniform Act as requiring that the entry be based upon information transmitted to the recorder by one with firsthand knowledge and a business duty to know and report the information” (McCormick, Evidence (2d ed. 1972) §310, p. 726).
 

 McCormick,
 
 supra
 
 (p. 727, fn. 64), cites
 
 Taylor
 
 v.
 
 Centennial Bowl, Inc., 65
 
 Cal.2d 114 [52 Cal.Rptr. 561, 416 P.2d 793], in which our Supreme Court overruled a trial court’s exclusion of a police report on the grounds that although the officer was only a custodian of reports filed by other police officers, he could introduce the report into evidence if it was based upon information obtained from other police officers and public officials whose job it is to know the facts recorded.
 

 The admission of those portions of both reports pertaining to the cause of the fire is also supported by an alternative test of reliability, namely, a party will not admit things damaging to its own position unless believed true. The authorities cited by Southern Pacific on this issue generally lack this guarantee of accuracy, and also did not involve “admissions by a party against interest.”
 
 (Behr
 
 v.
 
 County of Santa Cruz,
 
 172 CaI.App.2d 697 [342 P.2d 987] (State Division of Forestry report);
 
 Harrigan
 
 v.
 
 Chaperon,
 
 118 Cal.App.2d 167 [257 P.2d 716] (city fire inspector’s report);
 
 Johnson
 
 v.
 
 Aetna Life Insurance Co.,
 
 221 Cal.App.2d 247 [34 Cal.Rptr. 484] (hospital record). All involved reports by third parties.
 
 Dahl-Beck, supra,
 
 involved a report prepared by the party who offered it into evidence. We conclude that an ample foundation for classifying the reports in the instant case as authorized or adoptive admissions pursuant to Evidence Code sections 1221 and 1222, may be found in Bays’ testimony on the preparation and function of both reports.
 

 Southern Pacific, however, claims the cryptic response to the question of cause of the fire
 
 (“apparently
 
 started by transients”; italics added) cannot be an admission since it is an opinion. We do not find this
 
 *787
 
 argument persuasive. The phrase is subject to alternative interpretations. Brockman may be transmitting a conclusion that was within the
 
 personal knowledge
 
 of those he interviewed, whether Southern Pacific employees or not, but qualified the conclusion with the word “apparently” because it was not within his
 
 own personal knowledge.
 
 The usual requirement of personal knowledge is dispensed with in the case of admissions (Witkin, Cal. Evidence (2d ed.) § 499; McCormick, Evidence, § 263, and cases cited therein)-.
 

 Further, even assuming that “apparently” denotes that the response was only Brockman’s opinion, under current law, no reason exists for its exclusion. The rules pertaining to the necessary foundation for conclusions are not applicable to out-of-court admissions against interest. As stated in McCormick,
 
 supra,
 
 at page 632: “As we have seen, that rule has as its object the regulation of the interrogation of a witness on the stand, so as to elicit his answers in the more concrete form rather than in terms of inference. In its modem form it is a rule of preference for the more concrete answers, if the witness can give them, rather than a mle of exclusion. In any view, this mle, designed to promote the concreteness of answers on the stand, is grotesquely misapplied to out-of-court statements, such as admissions, where the declarant’s statements are made without thought of the form of courtroom testimony and where it can only be applied by excluding the statement, whereas in the courtroom if the opinion objection is sustained, counsel may reframe his question in the preferred form.”
 

 We note that one of the cases cited by the trial court as authority for admission of both reports,
 
 Dillenbeck
 
 v.
 
 City of Los Angeles, 69
 
 Cal.2d 472 [72 Cal.Rptr. 321, 446 P.2d 129], upheld the admission of Los Angeles Police Department safety mies as implied admissions despite their characterization as “opinions.” The Supreme Court held that it would take judicial notice of the Los Angeles Police Department qualifications to give expert testimony on what constitutes due care.
 

 Breidert
 
 v.
 
 Southern Pac. Co.,
 
 272 Cal.App.2d 398 [77 Cal.Rptr. 262], cited by Southern Pacific, bears no factual resemblance to the instant case, and its reasoning has been criticized by several writers.
 
 [19]
 

 
 *788
 
 We also note that Southern Pacific does not demonstrate how the alleged error in the admission of the reports was prejudicial in the face of the above detailed evidence concerning itinerant activity in the Mission Bay Yard and the February
 
 1969
 
 fire which destroyed the twin of the warehouse.
 
 [20]
 
 Furthermore, Southern Pacific made no effort to disclose to the jury the basis and origin of either report, despite the trial court’s repeated admonitions to counsel that he expected the jury would be given evidence in order to weigh the probative value of the reports. Apparently, Southern Pacific recognized at that time that the evidence was merely cumulative and, therefore, even if the admission were improper, it could not be prejudicial
 
 {Nesbitt Fruit Products, Inc.
 
 v.
 
 Del Monte Beverage Co.,
 
 177 Cal.App.2d 353, 364 [2 Cal.Rptr. 333]). Southern Pacific could have called Brockman to testify as to his sources, but chose not to. It should have no complaint now, when no effort was made to qualify or ameliorate whatever impact it may have had at the trial.
 

 Southern Pacific also complains of the tenants’ and owners’ use of discovery between it and the codefendant Reikes, which indicated that after the February 1969 fire, Reikes’ employee Olds brought the presence of empty wine and liquor bottles to the attention of Southern Pacific and
 
 *789
 
 the fire department. Southern Pacific denied receiving any complaint from Olds. The pertinent portion of the record, quoted in detail below,
 
 [21]
 
 indicates that Reikes’ response to the request for admission of fact was not construed as an admission on the part of Southern Pacific but was ruled evidence as to a//parties.
 

 Unlike
 
 Shoei Kako Co.
 
 v.
 
 Superior Court,
 
 33 Cal.App.3d 808 [109 Cal.Rptr. 402],
 
 Petersen
 
 v.
 
 City of Vallejo,
 
 259 Cal.App.2d 757 [66 Cal.Rptr. 776], and
 
 Associates Discount Corp.
 
 v.
 
 Tobb Co.,
 
 241 Cal.App.2d 541 [50 Cal.Rptr. 738], cited by Southern Pacific, where the issue was whether party A could introduce the responses furnished by party B in answer to interrogatories propounded by party A for use in evidence against a “bystander” party C, the instant case concerns C’s introduction of the fruits of discovery conducted between A and B, to be used in evidence against A. This difference in configuration is important, in light of the underlying rationale for the principle discussed in Southern Pacific’s argument: “It would be unreasonable and absurd to permit questions and answers respectively propounded and received in an interrogatory proceeding between two parties
 
 to be used against a third party when the latter is not given the right to propound cross-interrogatories or to exercise the privilege conferred upon the party initiating the proceeding by [Code Civ.
 
 Proc.]
 
 section 2030 to require the adverse party to whom the interrogatories are directed to make a further
 
 response” (italics added).
 
 (Associates Discount Corp.
 
 v.
 
 Tobb Co., supra,
 
 at pp. 551-552;
 
 *790
 

 Castaline
 
 v.
 
 City of Los Angeles,
 
 47 Cal.App.3d 580, 589 [121 Cal.Rptr. 786].) Thus, the rationale is not, as Southern Pacific implies, an anomalous requirement of privacy or privity, but rather a concern over a collusive and conclusive use of discovery products against an unaware third party. Southern Pacific propounded the interrogatories, phrased the questions, and was entitled, pursuant to Code of Civil Procedure section 2030 to submit further interrogatories, recross interrogatories, or to demand further response.
 

 Furthermore, Southern Pacific’s relationship with the codefendant Reikes as “non-adverse” is neither relevant nor entirely correct. The 1971 amendment to Code of Civil Procedure section 2030 (Stats. 1971, ch. 1643, § 1) authorizes the service of interrogatories on “any other party” rather than only on “any adverse party.” The use of those interrogatories at trial is governed by Code of Civil Procedure section 2016, subdivision (d), which sets down no special rules for admission of discovery conducted between nonadverse parties. In addition, for purposes of discovery proceedings, “adversity” is a question of
 
 issues,
 
 not
 
 interests.
 
 In
 
 Gorman Rupp Industries, Inc:
 
 v.
 
 Superior Court,
 
 20 CaI.App.3d 28, 31 [97 Cal.Rptr. 377], the court cited as persuasive the following reasoning of the federal district court in
 
 Carey
 
 v.
 
 Schuldt,
 
 42 F.R.D. 390: “ ‘The judicial definition of “adverse” parties is those parties who are on opposite sides of an issue raised by the pleadings or otherwise presented by the record. [Citations.] This serves well as a general principle. But it requires explanation, which has not been forthcoming, for proper application to specific situations. In determining “adversity,” the
 
 focus is on issues, and not interests.
 
 Conflicting interests, without more, do not constitute “adversity.” To be “adverse” the parties must oppose each other on an issue in the case. “Adversity” does not mean that one party
 
 must
 
 be seeking a judgment or recovery against the other party; but it does mean that one party strives to win a point at issue at the expense of the other. When two parties are contesting an issue, and the outcome of the litigation will be, or may be, different as to either party due to the determination of that issue, then they, are “adverse” within the meaning of Rule 33.’ ” (Italics partially added.)
 

 Thus, the very elements absent in the authorities relied upon by Southern Pacific, notice of responses and opportunity and incentive to further examine the responding party, are clearly present here.
 

 
 *791
 
 The purpose of discovery and the legislative policy of broadening its scope and application further supports the decision of the court below. In response to the court’s reluctance to. admit interrogatories in
 
 Associates Discount,
 
 above, where it construed then Code of Civil Procedure section 2030 (“
 
 ‘Solely for their information,
 
 copies of all interrogatories arid of all answers thereto shall be served upon all other parties ...’ ” (p. 551) to limit admissibility against third parties, the state Legislature amended Code of Civil Procedure section 2030 to delete the words “Solely for their information” (Stats. 1974, ch. 732, § 1).
 

 Finally, as another court concluded in similar circumstances, “it appears that the interrogatory issue is really much ado about nothing”
 
 (Castaline,
 
 p. 590). In any event, whatever error may have been made in admitting the Reikes interrogatory and response was certainly harmless as there was nothing that hád not been introduced into evidence; earlier when the Olds deposition was properly read. This deposition further elaborated on itinerant activity, including instances of break-ins on Reikes’ premises, and the circumstances of a conversation with Bushner of the Southern Pacific real estate department, in which itinerants were discussed; Southern Pacific’s counsel recognized the redundancy at the time of his initial objection.
 

 Finally, Southern Pacific asserts that the trial court erred in excluding evidence relating to the risk assumed by the tenants of the low-rent warehouse. As sufficiently indicated above, the general issue here was whether Southern Pacific had acted with reasonable care as to the tenants and owners. The standard of “reasonable care” as well as the resolution of the issues were properly reserved for the determination of the jury and will not be disturbed unless unsupported by substantial evidence.
 

 The evidence excluded pertained to the nominal rent paid by the tenants, the awareness of the tenants and owners
 
 [22]
 
 of the condition of the warehouse and its surroundings, and their failure to complain to Southern Pacific or to request changes. The record, however, reveals that evidence on each of these particulars was introduced. The low rent was noted by Southern Pacific’s engineer, Rear, and brought up in Southern
 
 *792
 
 Pacific’s opening statement. The tenants’ “awareness” of existing conditions was held to be a proper line of inquiry and pursued by Southern Pacific in examining tenants Seib and DiLeo. Southern Pacific personnel from at least three divisions were allowed to testify to the lack of tenant complaints, including absence of complaint by a former tenant LevyZentner which had moved from the warehouse 10 years earlier.
 

 The record discloses that only two lines of inquiry were closed to Southern Pacific. Because of a mistrial declared on May 13, 1974, due to Southern Pacific’s improper remarks on the tenants’ and owners’ property insurance, the court was sensitive to the economic allocation of risk argument insofar as it alluded to insurance. The court asked Southern Pacific’s counsel not to broach the subject with any witnesses without seeking a prior ruling. The second disallowed matter was whether the tenants had requested fire protection improvements while negotiating the terms of their leases with Southern Pacific. The trial court properly ruled that the leases obviously constituted the final embodiment and integration of the agreements and that evidence of prior negotiations contradicting the “as is” clause clearly violated the parol evidence rule (Civ. Code, § 1625). The trial court further noted, pursuant to the rule of
 
 Masterson
 
 v.
 
 Sine,
 
 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561], that evidence of the failure to request improvements which were not warranted by the terms of the lease as agreed to would mislead the jury by insinuating that the tenants had responsibility over conditions they could not change.
 

 The record indicates that Southern Pacific did not plead an assumption of risk defense and its subsequent motion to amend to add this defense was denied. Nevertheless, Southern Pacific argues that the tenants accepted the hazardous condition of the warehouse in return for the low rent. As indicated above, the low rent, the relationship of the parties, the terms of the leases, and the tenants’ recognition of certain of the conditions of the warehouse were considéred by the jury. The evidence also indicated that: 1) itinerant activity usually occurred at the times when the warehouse was deserted; 2) tenants rarely had occasion to inspect the area behind the building; 3) the tenants had received assurances that Southern Pacific patrols would handle the itinerant problem; 4) the expert testimony indicated that to be effective, most of
 
 *793
 
 the fire protection improvements, such as alarm systems, detector systems and sprinkler systems, required general installation by the landlord, Southern Pacific, rather than by the individual tenants; 5) responsibility for security patrols and adequate fire hydrants rested with Southern Pacific, as did the responsibility for an organization that adequately inspected buildings, evaluated risks, and promptly responded to fires. As noted in footnote 22, above, the economic “assumption of risk” theory has no relevance or application to those owners who suffered losses without being in a position to negotiate the conditions of the warehouse, e.g., adjacent and nearby property owners, and the owners of goods stored with warehouse tenants in the adjacent properties or across the street from the warehouse.
 

 Southern Pacific, without citation of authority, argues for an exception to the general rules of liability of
 
 Rowland
 
 v.
 
 Christian,
 
 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], set forth as follows, at page 119: “The proper test to be applied to the liability of the possessor of land in accordance with section 1714 of the Civil Code is whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others. . . .” (Also in accord,
 
 Brennan
 
 v.
 
 Cockrell Investments, Inc.,
 
 35 Cal.App.3d 796 [111 Cal.Rptr. 122], which applied
 
 Rowland
 
 v.
 
 Christian
 
 in a landlord/tenant context.)
 

 Southern Pacific’s economic assumption of risk argument is without support in law or policy.
 
 [23]
 
 Southern Pacific notes that expert Berg testified as to what a reasonable landlord “could' have”
 
 [24]
 
 done, but claims prejudice in the exclusion of its hybrid theory of “economic factors.” In fact, Southern Pacific failed to ask the only question relevant to the jury’s evaluation of Berg’s testimony, namely, the actual cost of the improvements.
 

 We conclude that since there is no merit to any of Southern Pacific’s contentions, the judgments on the verdicts against Southern Pacific must be affirmed.
 

 
 *794
 

 II The Tenants’ and Owners’ Appeal
 

 As indicated above, these appeals are from the order signed March 28, 1975, after the matter was heard by the court on January 20, 1975, pursuant to the stipulation of the parties.
 

 The main questions are whether the trial court properly ruled as a matter of law that: 1) prejudgment interest pursuant to Civil Code section 3287, subdivision (a), is not available in tort actions, such as the instant ones, for damages for the loss of real and personal property; and 2) the evidence established that the damages of the tenants and owners could not be made certain.
 

 Southern Pacific first argues that the trial court’s ruling that the statute does not apply to actions in tort is supported by
 
 King
 
 v.
 
 Southern Pacific Co.,
 
 109 Cal. 96 [41 P. 786].
 
 King
 
 involved a fire negligently caused by the employees of the railroad; the fire then spread to the warehouse in which King’s principal (Stephens) had stored his goods. The major question on appeal was whether the trial court erred in instructing the juiy to add prejudgment interest from the date of the fire. In
 
 King,
 
 our Supreme Court concluded (at p. 99): “In a case of this character the question of interest must be left to the discretion of the juiy.” Civil Code section 3287, subdivision (a), was not mentioned in
 
 King,
 
 nor was there any question as to whether damages were certain. Thus, despite the appealing factual similarity of
 
 King
 
 to the facts of the instant case, we do not find it persuasive or pertinent here where the juiy awarded the damages to the tenants. Besides the patent ambiguity of the Supreme Court’s above quoted statement in
 
 King,
 
 the case was decided in 1895, and relied on the companion case of
 
 Stephens
 
 v.
 
 Southern Pacific,
 
 109 Cal. 86 [41 P. 783], which held that the court erred in arbitrarily requiring the jury to add interest from the date of the fire as the award of interest was in the discretion of the jury pursuant to Civil Code section 3288. More importantly, the subsequent decisions of the courts of this state have failed to cite or rely on
 
 King
 
 for the interpretation proposed by Southern Pacific here.
 

 Preliminarily, we find appropriate and helpful a brief description of the development of the common law rules predating Civil Code section
 
 *795
 
 3287.
 
 [25]
 
 We are indebted for this summary to the insightful comment in 5 UCLA L. Rev. 262, at pages 264-265: “In this country interest was allowed as damages at an early date in the case of ‘liquidated’ claims, but was denied when the amount due the plaintiff was considered ‘unliquidated.’ This classic distinction was applied
 
 both in cases based on contract
 
 and
 
 also in those based on tort when money had been wrongfully detained by another.
 
 As an alternative to this test, some early cases indicated that interest was to be given in contract cases and denied or made discretionary in cases of tort. Thus, by the middle of the 19th century, several variations on the interest damages theme were extant, but the prevailing view
 
 had apparently progressed beyond the limits of allowing interest on only strictly liquidated claims.
 
 If the amount of the plaintiff’s claim, even though not liquidated, could be determined by reference to well established market values or by computation, he was given interest as a matter of law. And even when the damages were not of this type, interest was often allowed in the discretion of the jury. The rules which pronounced this prevailing position of the time were codified in the final draft of the New York Civil Code completed in 1865, and they were made a part of California law as sections 3287 and 32881
 
 [26]
 
 ) of the California Civil Code when that work was adopted in 1872.”[
 
 27
 
 ](Italics supplied.)
 

 Thus, when sections 3287 and 3288 were adopted in 1872, the key distinguishing factor was not, as Southern Pacific here argues, whether the cause of action arose in tort or contract, but rather whether the damages were readily ascertainable. Such a conclusion is given impetus by the carefully drafted language of the two sections, quoted above.
 
 [28]
 

 
 *796
 
 Section 3287, quoted at footnote 25, page 795 above, specifically refers to damages
 
 “certain, or capable of being made certain by
 
 calculation” (italics supplied). Section 3288, on the other hand, makes no reference to a requirement of certainty.
 

 Further, the language of section 3288 is expressly limited to certain types of actions. Section 3287, subdivision (a), applies by its terms without restriction to
 
 “Every person who is entitled to recover
 
 damages” (italics supplied). Subdivision (b) of section 3287 is expressly limited to
 
 “Every person who is entitled... to receive damages based upon a cause of action in contract. . .
 
 .” (italics supplied). Sections 3287 and 3288 were adopted from the same draft based on the Field’s Draft and at the same time.
 
 [29]
 
 Accordingly, under the usual rules of statutory interpretation, we can reasonably assume that if the Legislature had intended to limit section 3287, subdivision (a) to certain actions only, it would have specifically so stated, as it did in section 3288 and more recently enacted subdivision (b), which is limited to causes of action in contract.
 

 Our research also discloses that section 3287, subdivision (a), has been applied consistently to allow the recovery of prejudgment interest in causes of action other than those in contract. For example, in
 
 Mass
 
 v.
 
 Board of Education,
 
 61 Cal.2d 612 [39 Cal.Rptr. 739, 394 P.2d 579], our Supreme Court held that prejudgment interest could be awarded in a mandamus action. The court, at pages 625-626, reasoned that a general underlying monetary obligation existed, and specifically noted, at page 626, that “A mandamus action may include monetary damages
 
 for breach of contractual or tort
 
 obligations” (italics supplied). While the underlying obligation in
 
 Mass
 
 arose out of a contract, neither the language nor the reasoning of the court is so limited. Significantly, more recently in
 
 Tripp
 
 v.
 
 Swoap,
 
 17 Cal.3d 671 [131 Cal.Rptr. 789, 552 P.2d 749], our Supreme Court utilized
 
 Mass
 
 to hold that subdivision (a) of section 3287 applied to a mandamus action when the claim was based on a statutory obligation. Again, the rationale was that of a general underlying monetary obligation, and the court rejected the contention of the defendant that the “award of interest authorized under Civil Code
 
 *797
 
 section 3287 is limited to contract actions
 
 and actions sounding in
 
 tort” (p. 681; italics supplied). In doing so, our Supreme Court in
 
 Tripp
 
 relied on numerous authorities in which subdivision (a) of section 3287 had been applied, and at page 681, characterized these authorities as based on statutory obligation with “[no]
 
 mention [of] the existence of a contract
 
 as underlying plaintiff’s suit.” (Italics added.)
 

 Even prior to
 
 Tripp,
 
 the courts of this state had applied section 3287, subdivision (a), to causes that involved a breach of duty not arising from contract. For example, in
 
 Brian
 
 v.
 
 Ivey,
 
 150 Cal.App.2d 691 [310 P.2d 492], in an action to recover damages for negligently flooded croplands, the court denied recovery based on section 3287, not because the action sounded in tort, but rather because the damages were not capable of being made certain by calculation. In
 
 Friedman
 
 v.
 
 City of Los Angeles, 52
 
 Cal.App.3d 317 [125 Cal.Rptr. 93], the City of Los Angeles had demolished a building pursuant to its police power to protect public health and safety. The
 
 Friedman
 
 court concluded that owners of the building had been deprived of due process of law, including notice and opportunity to be heard. The appellate court affirmed an award of prejudgment interest for the destruction of the real property on the basis of section 3287, subdivision (a).
 

 As early as
 
 Schmidt
 
 v.
 
 Nunan
 
 (1883) 63 Cal. 371, the Supreme Court sustained the trial court’s award of prejudgment interest on the basis of then section 3287 in an action in which the Sheriff of San Francisco seized and later sold at an execution sale certain real property which the trial court found belonged to plaintiff, who had acquired it by sale from the judgment debtor.
 

 Section 3287 also has been applied to damages for inverse condemnation
 
 (Youngblood
 
 v.
 
 Los Angeles County Flood Control Dist.,
 
 56 Cal.2d 603 [15 Cal.Rptr. 904, 364 P.2d 840];
 
 Holtz
 
 v.
 
 San Francisco Bay Area Rapid Transit Dist.,
 
 17 Cal.3d 648 [131 Cal.Rptr. 646, 552 P.2d 430]). In
 
 Holtz,
 
 in allowing the owner to recover prejudgment interest for the loss of real property value to a building due to the withdrawal of lateral support, the court held, at page 657, that the certainty requirement of section 3287 does not apply to inverse condemnation litigation.
 

 We think tort actions for property damages, like the instant one, where the value of the property destroyed can readily be calculated by
 
 *798
 
 reference to market values or expert testimony, are more analogous to actions in inverse condemnation or contract than actions involving torts to the person. We repeat that our Supreme Court in
 
 Mass, supra,
 
 has rejected the distinction between contract and tort for purposes of section 3287. In the light of the language of the statute itself and the recent interpretations that are in accord with its common law history, we hold that the trial court erred in concluding that as a matter of law the statute could not be applied to award prejudgment interest in tort actions for damage to real or personal property.
 

 We turn, therefore, to the more complex and difficult question whether the record indicates that in the instant case, damages were “certain” or “capable of being made certain,” within the meaning of the statute and, if so, the particular date applicable as to each of the tenants and owners.
 

 Preliminarily, we review the applicable law. In applying section 3287, subdivision (a) to the instant case, prejudgment interest must be granted as a matter of right
 
 [30]
 
 if, as a matter of law, damages are “certain, or capable of being made certain by calculation.”
 
 [31]
 

 As indicated by the opinion of this court (Div. One) in
 
 Conderback, Inc.
 
 v.
 
 Standard Oil Co.,
 
 239 Cal.App.2d 664 [48 Cal.Rptr. 901], prejudgment interest runs from the date when the damages are of a nature to be certain or capable of being made certain by calculation and when the exact sum due to the plaintiff is -made known to the defendant.
 
 [32]
 
 Pursuant to the statute, if the defendant does not know or cannot readily ascertain damages, it is incumbent on the plaintiff to provide the defendant with some statement and supporting data from which the defendant can make the necessary determination
 
 (Conderback, supra,
 
 p. 690). The fact that the amount of the damages is in dispute is relevant only insofar as the dispute produces conflicting evidence from
 
 *799
 
 which the amount of damages cannot be ascertained with certainty
 
 (Lineman
 
 v.
 
 Schmid,
 
 32 Cal.2d 204, 212 [195 P.2d 408, 4 A.L.R.2d 1380]). When, as here, the amount of the damages is not in dispute, the lack of a dispute is merely a factor to be considered in the determination of whether the damages met the statutory requirement of certainty or capable of being made certain for fixing prejudgment interest
 
 (Executive Aviation, Inc.
 
 v.
 
 National Ins. Underwriters,
 
 16 Cal.App.3d 799, 808 [94 Cal.Rptr. 347]). The question presented is whether the damages meet the statutory requirement of certainty or capable of being made certain for fixing prejudgment interest as to exact time and amount, where damages are entered into by stipulation or admission, or where the answers to the interrogatories provide the defendant with an amount certain that remains undisputed.
 

 The tenants and owners contend that they are entitled to prejudgment interest from the date of June 29, 1969. While we are aware of the authorities that allow recovery from the day of the plaintiff’s loss
 
 (Greer
 
 v.
 
 Los Angeles Athletic Club,
 
 84 Cal.App. 272 [258 P. 155]), we find the better articulated argument the one we expressed in
 
 Conderback, supra,
 
 at pages 689-690;
 
 Iverson
 
 v.
 
 Spang Industries, Inc.,
 
 45 Cal.App.3d 303, 311 [119 Cal.Rptr. 399], decided by Division Four; and our decision in
 
 Macomber
 
 v.
 
 State of California,
 
 250 Cal.App.2d 391, 400-401 [58 Cal.Rptr. 393], We reasoned that where a defendant does not know what amount he owes and cannot ascertain it except by accord or judicial process, he cannot be in default for not paying it.
 

 We also note that where damages are not readily ascertainable, if the defendant admits to the amount of damages submitted by the plaintiff, the damages are held to be certain as to defendant for the purpose of section 3287, subdivision (a), and interest will be granted
 
 from the date of admission or stipulation (Abrams
 
 v.
 
 Motter,
 
 3 Cal.App.3d 828 [83 Cal.Rptr. 855]). In
 
 Abrams,
 
 at page 844, the rule, based on
 
 Caplan
 
 v.
 
 Schroeder,
 
 56 Cal.2d 515, 521 [15 Cal.Rptr. 145, 364 P.2d 321], was stated as follows: “Thus, it did not allow interest either from the commencement date utilized by the trial court or from the date argued for by the buyer,
 
 but only from the date of the stipulation as to value (which made it certain).”
 
 (Italics supplied.)
 
 (Gray
 
 v.
 
 Bekins,
 
 186 Cal. 389, 399 [199 P. 767].)
 

 
 *800
 
 As indicated above, the question of certainty and the issues subsumed within it, require a separate discussion as to each of the different groups of tenants and owners.
 
 [33]
 

 A—Levy-Zentner Company (No. 37997) and G &S Drayage
 

 Levy-Zentner Company (Levy-Zentner) owned a building adjacent to the warehouse; the northern portion of the Levy-Zentner building was completely destroyed when the warehouse fire spread to it. In September 1969, Levy-Zentner, on the basis of two expert estimates, furnished Southern Pacific with information indicating that the cost of the repair and replacement of the destroyed portion of its building was $99,051.66. Levy-Zentner’s complaint filed on November 5, 1970, alleged the identical amount. Thereafter, on April 4, 1974, Levy-Zentner filed a request for admission and interrogatories. Attached to these documents were the following two estimates made by general adjusters for reconstruction work: Hussman Co., $107,420; Anderson, Inc., $99,051.66.
 
 [34]
 
 The amount of the damages due to Levy-Zentner was never put in issue by Southern Pacific. The juiy returned a verdict for the sum of $99,051.66 and the judgment was for this amount.
 

 In applying section 3287, subdivision (a) to Levy-Zentner’s cause of action for loss of its real property, the only means of ascertaining the amount of the loss with certainty, as required by the statute, is by the expert opinion of a real estate appraiser or adjuster. If we are, therefore, to give any meaning to the statute in an instance of loss of real property, such as Levy-Zentner’s here, we think the estimates of an expert are appropriate to render the damages certain within the meaning of the statute. (We see no meaningful distinction between real and personal property damages for this purpose. Arguably, because of the uniqueness of real property, it is more difficult to ascertain its market
 
 *801
 
 value than that of personal property which is usually fungible or interchangeable.)
 

 We conclude, therefore, that by submitting expert documentation to Southern Pacific, Levy-Zentner amply supported its claim for damages, and by seeking the lowest of two estimates submitted,
 
 [35]
 
 Levy-Zentner rendered its undisputed damages certain as to Southern Pacific, as required by the statute. Accordingly, Levy-Zentner is entitled to prejudgment interest from April 4, 1974, the date on which it supplied Southern Pacific with the estimates of its experts.
 

 G & S Drayage (Drayage), owned by E. Seib, was a tenant of the warehouse on the date of the fire. The fire destroyed Drayage’s goods in storage waiting to be delivered to its customers, as well as all of its business records and accounts. Thus, Drayage’s damages were calculated as follows: Seib determined the goods actually in storage he received from two manufacturers as indicated below.
 
 [36]
 
 Southern Pácific stipulated to this amount. By its cross-complaint, Drayage sought damages in the amount of $12,482 for damages to the leased premises and to its “furniture, furnishings, equipment and miscellanea.” These allegations on their face suffer from lack of certainty. However, as indicated above, from its invoices, Drayage was able to ascertain losses of $6,958.33 in inventory. Drayage’s accounts receivable were more difficult to establish after the destruction of all of its business records. Drayage initially approximated the loss in accounts receivable between $9,000-$ 10,000 and finally arrived at a compromise figure of $9,500 with Southern Pacific.
 

 Seib’s checking account showed that he actually received from Drayage’s accounts receivable a total sum of $7,113.06. This amount was subtracted from the stipulated figure of $9,500. The combination of the inventory figure of $6,958.33 and the accounts receivable, $2,496.94, yields a total of $9,555.27.
 

 The fact that Drayage was initially uncertain of the amount of its loss can readily be ascertained from the discrepancy in the amount of
 
 *802
 
 damages sought by its cross-complaint ($12,482), and the total of $9,555.27 that resulted after the compromise and proof as to the accounts receivable. While such a variance does not render damages uncertain for the purpose of precluding an award of prejudgment interest pursuant to the statute
 
 (Coleman Engineering Co.
 
 v.
 
 North. American Aviation, Inc.,
 
 65 Cal.2d 396, 408 [55 Cal.Rptr. 1, 420 P.2d 713]), it is a factor for us to consider.
 

 Not until the time of the trial did Drayage establish that it had received $7,113.06 in accounts receivable. Accordingly, the lack of certainty of the accounts receivable until the time of trial is patent. The $9,500 figure was admittedly a compromise; the fact that payments were continually made to Drayage further establishes the uncertainty of the precise amount of Drayage’s loss as to its accounts receivable. Accordingly, we can only conclude that Drayage’s damages were not certain until the date of the stipulation, December 6, 1974, and prejudgment interest became due and owing to Drayage for its inventoiy and accounts receivable as of the date of the trial stipulation.
 

 B—Vermont Marble, Coors Distributing, Economy Sales, Inc., Lorane Anderson, G. A. Hutchinson & Son Draying, and G. A. Hutchinson III (No. 37,998); Harms of California and Ares Commercial Properties (No. 37,999) and Murray H. Fox Co., Inc., Vienna Sausage Manufacturing Company, and Fairchild Camera and Instrument Corporation (No. 38,004)
 

 Vermont Marble (Vermont) was a tenant of the warehouse and suffered loss and damage to its equipment and supplies in the fire. In response to Southern Pacific’s interrogatories, Vermont listed the items damaged, a total of $5,282.28. No further inquiry was made as to the amount and nature of the damages claimed. Southern Pacific admitted the damages at the pretrial conference. At the trial, pursuant to stipulation, the juiy was informed that the parties had stipulated that Vermont suffered damages in the amount of $5,200. The juiy entered its verdict in favor of Vermont for that amount and judgment was duly entered.
 

 Coors Distributing Company (Coors), also a tenant of the warehouse, lost equipment in the fire. In response to Southern Pacific’s interrogatory, Coors described the three refrigeration units destroyed and indicated that their value at the time of the fire was $8,239.54 (initial cost less
 
 *803
 
 depreciation). No further inquiry was made as to this amount and at the pretrial conference, Southern Pacific admitted the damages. At trial, pursuant to stipulation, the jury was informed that the parties had agreed that Coors’ damages totaled $8,200. The jury returned its verdict for Coors in this amount and the judgment was duly entered.
 

 Economy Sales, Inc. (Economy), another warehouse tenant, lost stock, office equipment and revenues from accounts receivable. Economy’s accounts receivable cards were destroyed. Economy’s answers to Southern Pacific’s interrogatories outlined the damages sustained, a total of $16,250. No further inquiries were made and Soúthem Pacific admitted the undisputed damages at the pretrial conference. At trial, the jury was informed that the parties had stipulated to this amount and the verdict and judgment in favor of Economy for $16,250 were entered.
 

 Lorane Anderson (Anderson), G. A. Hutchinson & Son Draying (Hutchinson), and G. A. Hutchinson III (represented here by its subrogee Aetna Insurance Company and hereafter referred to as Aetna), were all located in a building across the street from the warehouse. After the fire spread to this building, each of the above named parties sustained losses of personal property. In response to Southern Pacific’s interrogatories, each listed the items lost and the total amount of loss. As with Coors and Economy, no further inquiries were made and Southern Pacific admitted the damages at the pretrial conference. At trial, pursuant to stipulation, the jury was informed that the parties agreed to the following amounts of damages: Anderson, $1,800; Hutchinson, $4,391; Aetna, $1,000. Verdicts and judgments in these respective amounts ensued.
 

 Harms of California (Harms) and Ares Commercial Properties (Ares) were the owners of the building across the street from the warehouse. As the fire spread, the building was damaged, and Harms and Ares sustained losses of personal property and inventory. In answer to Southern Pacific’s interrogatories, Harms and Ares provided their own estimates of the costs of repair. No further inquiries as to the amount or nature of the damages were made. At trial, the jury was informed that the parties had agreed that Harms and Ares sustained damages of $5,650 and verdicts and judgment in that amount ensued.
 

 Murray H. Fox Co., Inc. (Fox), Vienna Sausage Manufacturing Company (Vienna Sausage) and Fairchild Camera and Instrument
 
 *804
 
 Company (Fairchild) were all tenants of the warehouse and sustained losses caused by the destruction of merchandise and other personal property with a readily ascertainable market value. Fox, Vienna Sausage and Fairchild filed their action on July 31, 1970, and claimed their respective losses of merchandise as follows: Fox, $12,048.09; Vienna Sausage, $3,276.38; Fairchild, $312.48. On August 13, 1971, in response to Southern Pacific’s interrogatories, all three indicated that documents which provided the basis for these amounts were available at the offices of their attorney. On April 24, 1974, in response to Fox, Vienna Sausage, and Fairchild’s request for admissions, Southern Pacific admitted that the damage of these three were at least as follows: Fox, $12,045; Vienna Sausage, $3,275; Fairchild, $310. Southern Pacific never subsequently disputed these admitted amounts that were subsequently read into the record as the basis of the stipulation and the ensuing verdict and judgment.
 

 As indicated above, all of the above mentioned tenants and owners answered Southern Pacific’s interrogatories with a list of items damaged and the corresponding costs of each. Although Southern Pacific’s interrogatories requested a statement of how these valuations were obtained, the above mentioned tenants and owners did not provide Southern Pacific with any documentation by which Southern Pacific could be made certain as to their loss. While damages may be made certain by reference to established or reasonable ascertainable market values
 
 (Lineman
 
 v.
 
 Schmid,
 
 32 Cal.2d 204, 209-211 [195 P.2d 408, 4 A.L.R.2d 1380]), where such values are not readily available to the defendant, the plaintiff must provide such documentation.
 

 In addition, the above named tenants and owners sought damages for items that were not common to Southern Pacific’s normal course of business; neither were these items of common usage so as to have an established market value that Southern Pacific might be charged with knowing. Accordingly, we cannot agree with the contentions that these tenants and owners had rendered their claims certain as to Southern Pacific as of the date of the interrogatories.
 

 However, Southern Pacific, in its response to requests for admission, admitted to damages. The pretrial order filed October 15, 1974, further stated that Southern Pacific had admitted the amounts of damages with respect to Vermont, Coors, Economy, Anderson, Hutchinson, Aetna,
 

 
 *805
 
 Harms, Ares, Fox, Vienna Sausage and Fairchild, and as to them, these amounts were not in issue.
 
 [37]
 
 Accordingly, Southern Pacific, by admitting to these damages and thereby eliminating them as an issue, conceded their certainty; interest should be granted to Vermont, Coors, Economy, Anderson, Hutchinson, Aetna, Harms, Ares and Fox from the date of Southern Pacific’s admission as to each of these parties, as indicated below.
 
 [38]
 

 That portion of the judgment entered on the verdict against Southern Pacific on the liability issue is affirmed; the portion of the judgment denying prejudgment interest to the tenants and owners, however, is reversed. The trial court is directed to modify this portion of the judgment and calculate the interest as to the various parties on the specified dates, as indicated above. The appeals from the minute order denying Southern Pacific’s motion for new trial and judgment notwithstanding the verdict are dismissed. The tenants and owners to recover costs on appeal.
 

 Rouse, J., and Cohn, * concurred.
 

 [1]
 

 Five actions were consolidated for trial. Superior court action No. 622422 was dismissed after default of those plaintiffs and dismissal of their cross-complaint. The four involved in this appeal are: No. 37997. brought by Levy-Zentner Company and including G & S Drayage Company, both owners of adjacent buildings; No. 37998 brought by Vermont Marble Company, Economy Sales, Inc., Coors Distributing Co. of San Francisco, and G. A. Hutchinson & Son Draying, all tenants of
 
 *769
 
 the warehouse and the Hutchinsons and L. Anderson, whose property was stored across the street from the warehouse; No. 37999 was brought by Harms of California and Ares Commercial Properties, both owners of buildings adjacent to Southern Pacific’s warehouse; No. 38004 brought by Murray H. Fox Company, Inc., Vienna Sausage Manufacturing Company, Inc., and Fairchild Camera and Instrument Corporation; each owned property in buildings in the area of Southern Pacific’s warehouse; Levy-Zentner also filed protective cross-appeals from the nonsuits granted to defendants Reikes and L & S Drayage. For convenience, all of these plaintiffs are hereafter collectively referred to as tenants and owners. We have followed the designation and spelling of the pretrial order, judgment and verdict, as most of the other documents are inconsistent as to the proper spelling and name of Ares or Area and Reikes or Riekes.
 

 [2]
 

 The notice of appeal is also taken from the minute order denying Southern Pacific’s motion for new trial and judgment notwithstanding the verdict. As the minute order was merged into the judgment, these purported appeals must be dismissed.
 

 [3]
 

 By stipulation of the parties, the prejudgment interest issue was tried by the court after the verdict.
 

 [4]
 

 Our statement is based on the record and the tenants’ and owners’ briefs, appropriately edited and supplemented as needed. The facts are set forth pursuant to the substantial evidence rule; Southern Pacific concedes the application of this rule. Additional facts will be set forth as needed in the discussion of the issues on appeal.
 

 [5]
 

 The city determines the location of its hydrants. However, the adequacy of these locations must be evaluated by the owner and if necessary, private hydrants and water supply extensions can be added by owners of large industrial sites.
 

 [6]
 

 Honsinger could not recall the exact time of the initial sighting but confirmed in his interview with Southern Pacific Fire Prevention Engineer Henry Klehs on the morning of June 30. 1969, that he told Klehs that the time of the first sighting was “5.05, plus or minus.” Klehs’ notes of that interview introduced in evidence so indicated.
 

 [7]
 

 This extinguisher had a range of only three feet and was almost totally ineffective against a wood fire.
 

 [8]
 

 At this time, an unknown party (probably a passing motorist) pulled the fire alarm in box No. 2374, at 16th and Illinois, three or four blocks from the warehouse.
 

 [9]
 

 Rule 139: “Evidence of itinerants camping under wooden platforms, around stockyards, or under bridges, must be energetically followed to prevent fires being built in hazardous locations.”
 

 [10]
 

 Neither Southern Pacific’s expert Jasich nor the tenants’ and owners’ expert Berg could determine the precise location of the origin of the fire.
 

 [11]
 

 The white color indicates that the fire was freely burning in open air rather than in an enclosed area; the V pattern, that it was burning upward and outward.
 

 [12]
 

 Gerhow consistently so maintained from the beginning. Berg modified his initial opinion to reach this conclusion after many additional hours of analyzing all of the depositions, photographs, etc. Southern Pacific’s expert Jasich on the other hand spent far fewer hours on the case and developed a theory that the fire originated as a result of the back-draft phenomenon, an explosion caused by the sudden ventilation of a preheated and oxygen-starved area after Anderson opened the warehouse door.
 

 [13]
 

 In view of this conclusion, it is not necessary to discuss in detail Southern Pacific’s alternative cause of the fire, namely, smoking by DiLeo, of L & S Drayage. the only tenant who was on the premises that afternoon. The record, however, indicates that DiLeo left about 316 hours before the first puff of smoke was seen. Southern Pacific’s own expert admitted that a carelessly dropped cigarette would have required only one to two hours, possibly three to burn through the floor. In addition, DiLeo was fanatically careful about smoking on the premises, as indicated by the posting of large no-smoking signs and the confinement of smoking to an area within 15 feet of the east wall, and provision of buckets. The fire was observed by Barlesi on the west side of the warehouse. The additional weaknesses in Southern Pacific’s theory of a fire that started inside the warehouse and was spread by the “backdraft” phenomenon have already been discussed above.
 

 [14]
 

 “(a) As used in this section, ‘defendant’ includes any party against whom the res ipsa loquitur presumption operates. “(b) The judicial doctrine of res ipsa loquitur is a presumption affecting the burden of producing evidence. “(c) If the evidence, or facts otherwise established, would support a res ipsa loquitur presumption and the defendant has introduced evidence which would support a finding that he was not negligent or that any negligence on his part was not a proximate cause of the occurrence, the court may, and upon request shall, instruct the jury to the effect that: “(1) If the facts which would give rise to a res ipsa loquitur presumption are found or otherwise established, the jury may draw the inference from such facts that a proximate cause of the occurrence was some negligent conduct on the part of the defendant; and “(2) The jury shall not find that a proximate cause of the occurrence was some negligent conduct on the part of the defendant unless the jury believes, after weighing all the evidence in the case and drawing such inferences therefrom as the jury believes are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct on the part of the defendant.”
 

 [15]
 

 “Every person who, himself, is exercising ordinary care, has a right to assume that
 
 *781
 
 every other person will perform his duty and obey the law, and in the absence of reasonable cause for thinking otherwise, it is not negligence for such a person to fail to anticipate an accident which can be occasioned only by a violation of law or duty by another person.”
 

 [16]
 

 Southem Pacific did not plead the defense of assumption of risk.
 

 [17]
 

 “Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: “(a) The writing was made in the regular course of a business; “(b) The writing was made at or near the time of the act, condition, or event; ’ “(c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and “(d) The sources of information and method and time of preparation were such as to indicate its trustworthiness.”
 

 [18]
 

 The present version of Evidence Code section 1271 was enacted by Statutes of 1965, chapter 299, section 2, page 1342, operative January 1, 1967, Statutes of 1965, chapter 299, section 151, page 1370.
 

 [19]
 

 In admitting the reports, the trial court considered the following criticism in Jefferson, California Evidence Benchbook, section 3.5: “The view of Breidert and Dillenbeck that the admissions-hearsay exception does not permit a party’s statement of opinion is subject to criticism. As Witkin points out,
 
 the better modern authorities take the position
 
 
 *788
 

 that since a party-declarant need not have had personal knowledge of the content of his statement, it should be no ground for objection that his statement is in the form of an inadmissible opinion.
 
 The Breidert and Dillenbeck view is not compelled by Evid C § 1220. The wording of § 1220 is taken without substantial change from Rule 63(7) of the Uniform Rules of Evidence, which in turn was based on Rule 506 of the Model Code of Evidence. The comment to the Model Code rule indicates that neither the knowledge requirement nor the opinion rule should apply to the hearsay exception of admissions. Furthermore, the Comment to Evid C § 1220 observes that hhe statement need not be one which would be admissible if made at the hearing.’ Does not this reference in the Comment to Evid C §1220 indicate that the opinion rule is not applicable to the hearsay exception? It is hoped that the appellate courts will reconsider this matter in subsequent cases.” (Italics added.)
 
 Breidert
 
 should be cited with caution as it is based upon
 
 Fibreboard Paper Products Corp.
 
 v.
 
 East Bay Union of Machinists,
 
 227 Cal.App.2d 675 [39 Cal.Rptr. 64], which was decided before the adoption of the Evidence Code. Referring to admissions against interest, Witkin concludes that “. .. it is no ground of objection that [a] statement is in a form which, had it been testimony on the stand, would have been excluded as an inadmissible opinion or conclusion.” (See Witkin, Cal. Evidence (2d ed.) § 499, p. 470.)
 

 [20]
 

 Southem Pacific attempts to use the split verdict to escape the “reversible error” doctrine mandated by article VI, section 13 of the state Constitution. Contrary to .Southern Pacific’s contention, and in view of the number, position,' and relationship of the parties to the four consolidated actions, it appears to us that a jury which considered 15 days of testimony by 20 witnesses and 51 exhibits, photographs and charts, and then reached a 10-2 verdict after 10 hours, was not in great doubt on the question of liability.
 

 [21]
 

 Mr. McDonald: “Now, I have one more set before we get to the amendment to the answers, and that is the Southern Pacific Interrogatories filed on or about April 27, 1973, with request for admissions filed on or about April 27, 1973, and S. Reikes’ answers to the same, filed on or about May 21, 1973. Let’s go way back. It is just the request for Admission No. 1. ‘That neither you nor the tenant of the premises in question where your inventory, goods, stock and/or equipment were stored [where applicable] ever complained to Southern Pacific Transportation Company, or its predecessor, Southern Pacific Company, including but not limited to Southern Pacific Police Department, or any agent thereof, concerning the presence of itinerants on or about the premises where the fire occurred.’ And the answer by S-. Reikes: ‘Approximately, February of 1969, Matthew Olds. The person at Southern Pacific to whom the complaint was tendered is unknown. In February of 1969 there was a fire in the leased premises occupied' by S. Reikes and Sons and during the investigation, after the fire, Mr. Olds brought
 
 to the
 
 attention of a representative of the Southern Pacific Company, the San Francisco Police Department, and the San Francisco Fire Department, the fact that empty wine and liquor bottles had been discovered in the mornings in the area adjoining the leased premises for quite some time and the possibility that a fire was started by itinerants in the area during the night.’.... Whether the complaint was in writing, and the answer of S. Reikes was: ‘No.’ ”
 

 [22]
 

 Southem Pacific does not articulate why adjacent owners and those whose property was stored across the street can be charged with awareness of the low rent and conditions in the warehouse or why any of the tenants could have been aware of its inadequate and confused internal allocation of the responsibilities for fire prevention and inspection.
 

 [23]
 

 Southem Pacific introduced its theory of economic assumption of risk by the tenants and owners at the first trial of this action. The tenants and owners thereupon propounded interrogatories to Southern Pacific on the total
 
 profitability
 
 of the warehouse operation and its relation to Southern Pacific’s railroad business, as most of the tenants were railroad customers. Southern Pacific objected to these interrogatories and thus precluded the tenants and owners from litigating this or other economic factors.
 

 [24]
 

 The record, however, indicates that Berg could not testify as to what a reasonable landlord “should have” done, since that would have invaded the province of the jury.
 

 [25]
 

 “(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.... [Enacted 1872, based on Field’s Draft NY CC § 1835.] “(b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed.” (Added by Stats. 1967, ch. 1230, § 1, p. 2997.)
 

 [26]
 

 “In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.”
 

 [27]
 

 Hereafter all statutory references are to the Civil Code unless otherwise indicated.
 

 [28]
 

 We are, of course, aware that the initial distinction has not been consistently followed, as several cases involving section 3288 have required that damages be readily ascertainable.
 

 [29]
 

 For the purposes of this case, neither section was significantly amended until 1967 when section 3287 was amended to designate the first paragraph as subdivision (a) and the second paragraph was added as subdivision (b) (Stats. "1967, ch. 1230, § 1, p. 2997, effective Nov. 8, 1967). Accordingly, all references to section 3287 prior to the effective date of the 1967 amendment must be construed as references to present subdivision (a) only.
 

 [30]
 

 Southern Pacific’s concession of this point is supported by the applicable case law
 
 (Leaf v. Phil Rauch, Inc.,
 
 47 Cal.App.3d 371, 376 [120 Cal.Rptr. 749]).
 

 [31]
 

 Southem Pacific does not assert that its challenge on the issue of liability is of any significance
 
 (Rabinowitch
 
 v.
 
 Cal. Western Gas Co.,
 
 257 Cal.App.2d 150, 161 [65 Cal.Rptr. ID-
 

 [32]
 

 The tenants and owners in their opening brief cite a number of cases that they contend stand -for the proposition that interest begins to run from the date the damage first occurred, not as of the date such damages are made known to the defendant. However, the majority of these cases dealt with misappropriated or wrongfully withheld funds. In those instances, damages are readily ascertainable to the defendant at the time plaintiff suffers the damage. The same, of course, does not apply to the instant case.
 

 [33]
 

 For convenience, we have retained the grouping of the tenants'and owners according to the numbers of the actions. We have also augmented the record on our motion with the superior court file in No. 624188 to obtain some of the dates and documents pertinent to this portion of the appeal.
 

 [34]
 

 The fact that the estimates of the experts vary does not render the sum of damages uncertain, as variances are not uncommon in estimates for reconstruction work of the magnitude involved for Levy-Zentner’s premises (cf.
 
 Coleman Engineering Co.
 
 v.
 
 North American Aviation, Inc.,
 
 65 Cal.2d 396, 408 [55 Cal.Rptr. 1, 420 P.2d 713]).
 

 [35]
 

 As the cost of repairs necessarily would be one of the two estimated figures, Levy-Zentner’s damages were certain to be at least $99,051.66, or the lower figure.
 

 [36]
 

 Lakewood Cotton Products $ 4,582.88 United Manufacturing Co. $ 2,375.45 Total for destroyed goods $ 6,958.33
 

 [37]
 

 Southem Pacific, when admitting to the damages, “reserved a right... to prove any additional facts available at the time of trial.” Vermont, Harms and Fox in their briefs do not contend that they advanced any additional facts with respect to damages. The record so indicates.
 

 [38]
 

 Vermont, Coors, Economy, Anderson, Hutchinson, Aetna, Harms and Ares, on April 1, 1974; Fox, Vienna Sausage and Fairchild on April 22, 1974.